UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MILLER'S ALE HOUSE, INC.,

      Plaintiff,

v.                              Case No:   6:15-cv-1109-Orl-22TBS

DCCM RESTAURANT GROUP, LLC,

      Defendant.

_____

## REPORT AND RECOMMENDATION

Pending before the Court is Defendant's Motion to Dismiss and for Summary Judgment (Doc 21).   Upon due consideration, I respectfully recommend that the motion be **GRANTED in part** and **DENIED in part**.

## I. Background

Plaintiff Miller's Ale House, Inc. ("Miller's" or "Plaintiff"), operates approximately 70 sports-bar restaurants throughout the United States, including 14 in the greater Orlando/Polk County areas (Doc. 1, ¶¶ 7-8).   Miller's restaurants are marked by outdoor signs which typically consist of the phrase "ALE HOUSE" preceded by the geographic location of the restaurant in red, uppercase block letters and may be preceded by the name "Miller's" in red, initial-letter-capitalized-only italics (Id. at ¶¶ 9-13).   So for example, the sign for one of Miller's restaurant's in Orange County, Florida reads, in red letters, "*Miller's* ORLANDO ALE HOUSE."   (Id. at ¶¶ 10-11).   Miller's alleges that as the result of widespread promotion, "the above-identified elements of Plaintiff's signs and similar branding materials" have acquired secondary meaning in the Orlando/Polk County areas because they are recognized "by the relevant public as identifying Plaintiff's

restaurants and restaurant services, distinguishing them from those of Plaintiff's competitors."   (Id. at ¶ 14).

Defendant DCCM Restaurant Group, LLC ("DCCM" or "Defendant") opened a sports-bar restaurant in Davenport, Polk County, Florida with a sign that says "*Davenport's* ALE HOUSE" in red letters (Id. at ¶¶ 18, 20-21).   DCCM's restaurant is near more than a dozen of Miller's restaurants in the greater Orlando/Polk County area (Id. at ¶ 21).   Miller's alleges that DCCM's sign is confusingly similar to its signs and likely to cause confusion and mistake among the consuming public that there is some affiliation, sponsorship, or approval of DCCM by Miller's (Id. at ¶¶ 20-23).   Miller's also alleges that DCCM is engaging in a deliberate effort to confuse and mislead the consuming public as to the source, affiliation, and/or sponsorship of its restaurant and restaurant services to gain and benefit from the goodwill associated with Miller's (Id. at ¶ 24).

Miller's concedes that the phrase "ale house" is generic and states that it is not suing DCCM for trademark infringement (Doc. 30, p. 1).   Instead, Miller's alleges that DCCM has committed the tort of unfair competition (Id.).   It argues that while a late-comer can use a generic term, it must make reasonable efforts to avoid using the term in a way that is likely to confuse consumers (Id. at p. 2).   Miller's maintains that DCCM is competing unfairly "because: (a) consumers in central Florida associate restaurants named '[Geographic Location Of Restaurant] Ale House' as well as the look of Miller's signs for those restaurants, with Miller's; and (b) rather than using reasonable efforts to avoid confusing consumers into thinking that its restaurant is part of the Miller's chain, DCCM has done the *opposite*."   (Id. at p. 8) (emphasis in original).   DCCM's actions allegedly "continue to be undertaken willfully in bad faith, are intentional, and

misappropriate Plaintiff's established goodwill and reputation." (Id. at ¶ 31).   Count I of Plaintiff's complaint is titled "False Designation of Origin and Unfair Competition Pursuant to Section 43(a) Of The [sic] Lanham Act (15 U.S.C. § 1125(a));" Count II is titled "Florida Common Law Unfair Competition;" and Count III is titled "Florida's Deceptive and Unfair Trade Practices Act."   Miller's seeks damages, an award of attorney's fees and costs, and an injunction restraining DCCM from, *inter alia*, "using, in any fashion, any words, terms, names, symbols, devices, or any combination thereof, in a manner confusingly or deceptively similar to Plaintiff's restaurant signage and related branding elements in connection with the promotion, advertising, solicitation, operation, conduct and expansion of Defendant's business." (Doc. 1, p. 10).

DCCM contends that this is a frivolous lawsuit, brought by a large restaurant chain against a small ale house, asserting claims Miller's has already lost on twice (Doc. 21, pp. 1-2).   DCCM maintains that the case should be dismissed or, alternatively, that it is entitled to summary judgment because "Miller's is collaterally estopped from asserting it has trademark rights in the words 'ale house' – on its own, coupled with a geographic term, or in red letters." (Doc. 21, p. 12).   DCCM argues that "Miller's is claiming a trademark infringement claim, packaged as an unfair competition claim," and that Miller's "unfair competition" theory is not recognized by the Eleventh Circuit (Doc. 42, p. 6).

## II. Standards

DCCM has moved to dismiss Miller's complaint pursuant to Rule 12(b)(6) or alternatively, for summary judgment pursuant to Rule 56.   A motion to dismiss under Rule 12(b)(6) attacks the legal sufficiency of the complaint.   In determining whether dismissal on this basis is appropriate, the complaint must be construed in the light most favorable to the plaintiff, and all well-pleaded facts must be accepted as true.   Ashcroft v.

Iqbal, 556 U.S. 662, 678 (2009); Ironworkers Local Union 68 v. AstraZeneca Pharm., LP, 634 F.3d 1352, 1359 (11th Cir. 2011).   The Supreme Court has explained that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."   Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 546 (2007).   But, a plaintiff's claim for relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555.   "Factual allegations must be enough to raise a right to relief above the speculative level[.]"   Id.   A complaint must be dismissed if it does not plead "enough facts to state a claim to relief that is plausible on its face."   Id. at 570.   Legal conclusions devoid of factual support are not entitled to an assumption of truth.   Mamani v. Berzain, 654 F.3d 1148, 1153 (11th Cir. 2011) (citing Iqbal, 556 U.S. at 678).

To obtain summary judgment the movant must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).   In making this determination, the evidence "must be viewed in the light most favorable" to the non-moving party.   Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).   Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party."   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is appropriate if the opposing party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."   Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).   The "mere existence of a scintilla of evidence in support of the [opposing party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]."   Anderson, 477 U.S. at 252.

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record that demonstrate "the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 323.   The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250 (quoting FED. R. CIV. P. 56(e)).   Once the moving party has proved that no material facts exist, the non-moving party must do more than raise a metaphysical or conjectural doubt about issues requiring resolution at trial.   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).   At that point, the non-moving party must support its assertion that a fact is genuinely disputed.   FED. R. CIV. P. 56(c)(1).

### III. Discussion

In Count I of its complaint Miller's alleges that DCCM's use of outdoor signage that "uses a geographic location in combination with the phrase ALE HOUSE with highly similar font styles, coloring, and lettering as used by Plaintiff" "constitute[s] false designation of origin and [is] likely to create confusion, or to cause mistake, or to deceive the public and relevant consumers as to the origin, sponsorship or approval of Defendant's services by Plaintiff, in violation of 15 U.S.C. § 1125(a)."   (Doc. 1, ¶¶ 19-20, 29).   This is not the first time Miller's "ALE HOUSE" branding has been examined under the Lanham Act.

On March 26, 1998, Miller's predecessor in interest, Ale House Management, Inc. ("AHM"), sued Raleigh Ale House, Inc. ("RAHI"), for false designation of origin of trade name and trade dress under § 43(a); tradename infringement, trade dress infringement, and unfair trade competition under federal common law and North Carolina law; and copyright infringement under the Copyright Act, 17 U.S.C. § 101 *et seq*, in the Eastern

District of North Carolina because RAHI was preparing to open a restaurant in Raleigh, NC, named "Raleigh Ale House."   See Ale House Mgmt., Inc. v. Raleigh Ale House, Inc., 205 F.3d 137, 140 (4th Cir. 2000); Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC, 745 F. Supp. 2d 1359, 1366 (S.D. Fla. 2010) aff'd, 702 F.3d 1312 (11th Cir. 2012). The district court granted summary judgment for RAHI and awarded it attorney's fees under the Lanham Act and the Copyright Act.   See Raleigh Ale House, 205 F.3d at 140. The Fourth Circuit affirmed, finding that "AHM has no protectable interest in the words 'ale house,'" which are "generic words for a facility that serves beer and ale, with or without food, just as are other similar terms such as 'bar,' 'lounge,' 'pub,' 'saloon,' or 'tavern.'"  Id. at 141.

In 2009, Miller's brought suit in the Southern District of Florida against Boynton Carolina Ale House, LLC, for trademark and trade dress infringement under the Lanham Act and Florida law, copyright infringement, unfair competition under the Lanham Act, and trademark dilution.   At the time, "[e]ach Miller's location display[ed] its name (the geographic prefix plus the term 'ALE HOUSE') in red letters on the outside of its building." Boynton Carolina Ale House, 745 F. Supp. 2d at 1364.   Miller's argued that as a result of its promotional efforts, many Florida residents associated the words "Ale House" exclusively with Miller's restaurants.   Id. at 1364-65.   Boynton Carolina Ale House, LLC named its restaurant "Carolina Ale House," used a red logo and sign featuring the words "Ale House," had a similar floor plan, employee uniforms, menu items, and promotions as Miller's, and was located one mile from Miller's "BOYNTON BEACH ALE HOUSE."  Id. at 1365-66; Doc. 42-1, p. 5.   The court held that Miller's trademark infringement claim was barred by the doctrine of issue preclusion based upon the Fourth Circuit's finding that "ale house" was a generic term that could not be protected under federal trademark law.

Boynton Carolina Ale House, 745 F. Supp. 2d at 1369-73 (citing Raleigh Ale House, 205 F.3d 137).   The court also determined that Miller's claimed trade dress had not acquired secondary meaning and was not inherently distinctive.   Id. at 1375-76.   The Eleventh Circuit affirmed, finding that Miller's has no protectable interest in "ale house" because the Fourth Circuit determined in previous litigation between the parties that the words were "generic words for a facility that serves beer and ale, with or without food."   Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC, 702 F.3d 1312, 1317 (11th Cir. 2012). Miller's did not contest the district court's conclusion that it had failed to establish that its trade dress acquired secondary meaning, and that Miller's had failed to raise a genuine issue of material fact as to the essential element of distinctiveness.   Id. at 1323-24.   The court explained:

> We find nothing particularly unique in a restaurant fixing its name in red letters on the outside of its building and on its menu, branding items it sells with that name, dressing its staff in khakis and a polo shirt, featuring a center bar with a soffit, offering seating at "high-top" tables, and paneling its walls with wood. These are the prototypical features—what we might call the "common ... design," *Brooks Shoe*, 716 F.2d at 858–of a standard sports bar or brew pub.

Id.

In both of these cases, Miller's brought claims of trademark infringement and unfair competition against a competing restaurant's use of the phrase "ale house" in its name, preceded by a geographic identifier.   DCCM argues that the current action should be dismissed or, alternatively, that it is entitled to summary judgment because "Miller's is collaterally estopped from asserting it has trademark rights in the words 'ale house' – on its own, coupled with a geographic term, or in red letters."   (Doc. 21, p. 12).

"Issue preclusion … bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even

if the issue recurs in the context of a different claim." Taylor v. Sturgell, 553 U.S. 880, 892 (2008) (quoting New Hampshire v. Maine, 532 U.S. 742, 748-49 (2001)). "This serves 'the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation.'" Boynton Carolina Ale House, 702 F.3d at 1318 (quoting CSX Transp., Inc. v. Bhd. of Maint. of Way Emps., 327 F.3d 1309, 1317 (11th Cir. 2003)). Issue preclusion applies when

> (1) the issue at stake is identical to the one involved in the prior litigation; (2) the issue was actually litigated in the prior suit; (3) the determination of the issue in the prior litigation was a critical and necessary part of the judgment in that action; and (4) the party against whom the earlier decision is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding.

Id. (citing CSX Transp., 327 F.3d at 1317).

To determine whether issue preclusion applies, the Court must first ascertain what issues are being raised in the action. Count I of Miller's complaint is brought under the Lanham Act, 15 U.S.C. § 1125(a) (Doc. 1, p. 7). Section 43(a) of the Lanham Act provides:

(a) Civil action

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C.A. § 1125(a).   "Regretfully, the body of law relating to the Lanham Act has developed into a tangled morass," Coach Leatherware Co. v. AnnTaylor, Inc., 933 F.2d 162, 171 (2d Cir. 1991), and is plagued by imprecise language used by courts and litigants.   Miller's complaint and brief are no exception.

"Section 43(a) of the Lanham Act creates a federal cause of action for unfair competition" in interstate commerce and "forbids unfair trade practices involving infringement of trade dress, service marks, or trademarks, even in the absence of federal trademark registration."   Univ. of Fla. v. KPB, Inc., 89 F.3d 773, 776 (11th Cir. 1996). Courts often find that a "prima facie" case under § 43(a) requires the plaintiff to show "(1) that the plaintiff had enforceable trademark rights in the mark or name, and (2) that the defendant made unauthorized use of it such that consumers were likely to confuse the two."   Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc., 508 F.3d 641, 647 (11th Cir. 2007) (quotations omitted).   See also Tana v. Dantanna's, 611 F.3d 767, 773 (11th Cir. 2010) ("To establish a prima facie case of trademark infringement under § 43(a), a plaintiff must show '(1) that it had trademark rights in the mark or name at issue and (2) that the other party had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two.'") (quoting Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc., 106 F.3d 355, 358 (11th Cir. 1997) opinion modified on reh'g, 122 F.3d 1379 (11th Cir. 1997)); SunAmerica Corp. v. Sun Life Assur. Co. of Canada, 77 F.3d 1325, 1334 (11th Cir. 1996) ("To establish a prima facie case in an ordinary trademark infringement suit, a claimant need only demonstrate that: (1) it enjoys enforceable rights in its mark, and (2) the alleged infringer

adopted a mark that is the same or confusingly similar.").   DCCM relies on similar quotations and argues that "[t]here is no wiggle room – the Eleventh Circuit requires a protectable trademark (or trade dress) to maintain an unfair competition claim under the false designation, passing off, and palming off provision of the Lanham Act."   (Doc. 42, p. 7).   According to DCCM, "Miller's is claiming a trademark infringement claim, packaged as an unfair competition claim" and Miller's "unfair competition" theory is not recognized by this Circuit (Doc. 42, p. 6).

In assessing a claim for trademark infringement, "[t]he starting point … is to query whether or not the purported mark is distinctive."   Boynton Carolina Ale House, 702 F.3d at 1317 (citing Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1357 (11th Cir. 2007)). There are "four gradations of distinctiveness: fanciful or arbitrary, suggestive, descriptive, and generic."   Id. (citing Am. Television & Commc'ns Corp. v. Am. Commc'ns & Television, Inc., 810 F.2d 1546, 1548 (11th Cir. 1987)).   A generic name "cannot be appropriated from the public domain," even if the name becomes in some degree associated with the source.   Welding Servs., Inc., 509 F.3d at 1358.   "A descriptive name, on the other hand, though not inherently distinctive, can acquire distinctiveness or 'secondary meaning' by becoming associated with the proprietor's product or service." Id. (quoting Am. Television & Commc'ns Corp., 810 F.2d at 1548–49).   "A name has acquired secondary meaning when 'the primary significance of the term in the minds of the [consuming] public is not the product but the producer.'"   Id. (quoting Am. Television & Commc'ns Corp., 810 F.2d at 1549).

Miller's previously brought claims for trademark infringement against two different competitors for their use of the phrase "ale house" combined with a geographic identifier, and lost.   See Boynton Carolina Ale House, 702 F.3d at 1318; Raleigh Ale House, 205

F.3d at 139.   Miller's now concedes that the phrase "ale house" is generic and represents that it "is not suing DCCM for trademark infringement."   (Doc. 30, pp. 1, 19).

"The term 'trade dress' refers to the appearance of a product when that appearance is used to identify the producer."   Dippin' Dots, Inc. v. Frosty Bites Distribution, LLC, 369 F.3d 1197, 1202 (11th Cir. 2004) (quoting Publ'ns Int'l, Ltd. v. Landoll, Inc., 164 F.3d 337, 338 (7th Cir. 1998) (internal quotations omitted)).   "'Trade [d]ress' involves the total image of a product and may include features such as size, shape, color ..., texture, graphics, or even particular sales techniques."   Id. (quoting AmBrit, Inc. v. Kraft, Inc., 812 F.2d 1531, 1535 (11th Cir. 1986) (internal quotations omitted; alteration in original).   "[T]o prevail on a trade dress infringement claim under § 43(a), the plaintiff must prove three elements: 1) its trade dress is inherently distinctive or has acquired secondary meaning, 2) its trade dress is primarily non-functional, and 3) the defendant's trade dress is confusingly similar."   AmBrit, Inc., 812 F.2d at 1535.

Miller's alleges that the overall image of its signs, *i.e.*, the phrase "ALE HOUSE" preceded by a geographic identifier in red, uppercase lettering that is sometimes preceded by the name "Miller's" in italics with only the first letter capitalized, has acquired secondary meaning and that the overall image of DCCM's sign is confusingly similar. Although this sounds like a claim for trade dress infringement and Miller's has relied on cases dealing with trade dress in its brief, Miller's represents that there "is no trade dress infringement claim in this litigation."   (Doc. 30, p. 19).

Miller's argues that the United States Supreme Court's decision in Kellogg Co. v. Nat'l Biscuit Co., 305 U.S. 111 (1938), "and its progeny hold that a late-coming competitor's use of generic terms in a confusing way is actionable unfair competition" under the Lanham Act (Doc. 30, p. 4 (emphasis omitted)).   Miller's asserts that there is a

"fairness obligation on late-coming adopters of a generic term already associated with a competitor" requiring the late-comer to "expend reasonable efforts to avoid using it *in a way* that is likely to confuse consumers."   (Id. at p. 2 (emphasis in original)).   Miller's argues that the way DCCM is using the generic phrase "ale house" is likely to cause consumers to think its restaurant is part of Miller's chain of restaurants.   Miller's characterizes its claim as being for "unfair competition," not trademark or trade dress infringement.

In Kellogg Co. v. Nat'l Biscuit Co., 305 U.S. 111 (1938), National Biscuit Company sued Kellogg Company to enjoin alleged unfair competition by the manufacture and sale of the breakfast food commonly known as shredded wheat.   National Biscuit claimed exclusive right to the trade name "Shredded Wheat" and the exclusive right to make pillow-shaped shredded wheat biscuits.   Id. at 116.   By using the same name and pillow-shaped biscuit, Kellogg was allegedly passing off its goods as those of National Biscuit. Id.   As the successor to companies formed by the inventor of shredded wheat, National Biscuit was the first user of the term shredded wheat.   At the expiration of the inventor's patent issued in 1895, the name of the patented article–shredded wheat–passed into the public domain and became a generic term.   Id. at 117-18.   Because the term was generic, National Biscuit was not entitled to exclusive use.   Id. at 116.   Still, because National Biscuit had been the only manufacturer of shredded wheat for many years, the public had come to associate the product and the term "shredded wheat" with that company.   Kellogg was therefore required to "exercise[e] its right to use the name 'Shredded Wheat' and the pillow-shaped biscuit … fairly … in a manner which reasonably distinguishes its product from that of plaintiff."   Id. at 120.

In Blinded Veterans Ass'n v. Blinded Am. Veterans Found., 872 F.2d 1035 (D.C.

Cir. 1989), the plaintiff, Blinded Veterans Association ("BVA"), sought to enjoin the

Blinded Americans Veterans Foundation ("BAVF") from using the words "blinded" and

"veterans" in its name and from using the initials "BVA" to describe itself.   Id. at 1036.

Writing for the court, now Justice Ginsberg found that "blinded veterans" was generic.

Id. at 1041.   The court then found that when "an organization's own name is generic, a

competitor's subsequent use of that name may give rise to an unfair competition claim

[under § 43(a) of the Lanham Act] if the competitor's failure adequately to identify itself as

distinct from the first organization causes confusion or a likelihood of confusion."   Id. at

1043.   The court cited "the paradigm case" of Kellogg Co. v. Nat'l Biscuit Co., 305 U.S.

111 (1938), and held that "the subsequent competitor cannot be prevented from using the

generic term to denote itself or its product, but it may be enjoined from passing itself or its

product off as the first organization or its product."   Id. at 1043.   On remand, the district

court was to look for "evidence that people associate 'blinded veterans' with BVA per se

and that, because of specific actions by BAVF that increase the risk of confusion, people

are likely to think BAVF is BVA."   Id. at 1046.

Although, as DCCM argues, the Eleventh Circuit has stated that a plaintiff "must

show" it has enforceable trademark rights in a mark or name to establish a prima facie

case under § 43(a), Custom Mfg. & Eng'g, Inc., 508 F.3d at 647, the Supreme Court has

recognized that § 43(a) "is one of the few provisions [of the Lanham Act] that goes

beyond trademark protection."   Dastar Corp. v. Twentieth Century Fox Film Corp., 539

U.S. 23, 28-29 (2003).   Kellogg and Blinded Veterans support a cause of action for

passing off (or palming off, as it is sometimes called), Dastar Corp., 539 U.S. at 28 n.1,

under § 43(a) of the Lanham Act when a generic term that has come to be associated

with the plaintiff is used by a competitor in a manner that is likely to cause confusion as to the affiliation, connection, or association of the competitor with the plaintiff, or as to the origin, sponsorship, or approval of the competitor's goods, services, or commercial activities by the plaintiff.   This is, as Miller's argues, a claim for "unfair competition," as are all § 43(a) claims.   See e.g., KPB, Inc., 89 F.3d at 775 ("Section 43(a) of the Lanham Act creates a federal cause of action for unfair competition, but is limited to interstate commercial activities."); Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc., 496 F.3d 1231, 1247 (11th Cir. 2007) ("Section 43(a) of the Lanham Act creates a 'federal cause of action for unfair competition.'").   But more precisely, Miller's has brought a claim for "passing off."

"[A] false designation of origin claim … proscribes the behavior of 'passing off' …." Custom Mfg. & Eng'g, Inc., 508 F.3d at 647 (quoting Dastar Corp., 539 U.S. at 28 n.1). See also Optimum Techs., Inc., 496 F.3d at 1248 ("[S]ection 43(a)'s language–which prohibits a 'false designation of origin'–has been construed by the courts as creating a federal action for 'passing off' ….").   "Passing off … occurs when a producer misrepresents his own goods or services as someone else's."   Dastar Corp., 539 U.S. at 28.   Miller's alleges that by using a naming convention and similar sign features, DCCM is improperly passing itself off (or attempting to pass itself off) as being associated with Miller's restaurants.   Cf. Optimum Techs., Inc., 496 F.3d at 1248 ("[A] passing off claim requires a showing that the defendant falsely represented that the plaintiff was the 'source' of the goods when it was not, that is, that it falsely suggested that the plaintiff was' "the producer of the tangible product sold in the marketplace.'").

DCCM argues that this claim is barred by issue preclusion because Miller's has already litigated the claims and issues presented here in the Eleventh Circuit and lost.   In

Boynton Carolina Ale House, Miller's brought claims for unfair competition and false designation of origin under the Lanham Act. Miller's argued the defendant "BCAH's use of 'Carolina Ale House' and 'ALE HOUSE' were likely to cause confusion, mistake and/or deception as to the source, sponsorship or approval by [Miller's] of BCAH's 'ale house' restaurant and services by [Miller's]." (Doc. 42-4 at 10-13; Doc. 42-5 at 7-10). Miller's alleged that it had rights in "the term 'Ale House' preceded by a geographic prefix," which had "come to be recognized by the relevant public [in Florida] as identifying [Miller's] establishments and distinguishing Plaintiff's goods and services from those of its competitors." (Doc. 42-1, ¶ 4). Miller's argued on summary judgment that its "branding theme … the formative 'Ale House' coupled with a geographic identifier" or "'Ale House' red signage with geographic descriptors on the buildings," was entitled to protection (Doc. 42-3 at 2-4). Miller's argued on appeal, just as it does here, that a claim for false designation of origin is "not limited to instances of trademark infringement," (Doc. 42-5 at 8), and that "a competitor's subsequent use of a generic name may give rise to an unfair competition claim 'if the competitor's failure adequately to identify itself as distinct from the first organization causes confusion or a likelihood of confusion.'" (Id. at 9-10) (quoting Blinded Veterans Ass'n, 872 F.2d at 1043)). Miller's even identified its claim as one for passing off (Id.).

The Eleventh Circuit found that issue preclusion barred Miller's claim for trademark infringement because it had already unsuccessfully litigated the issue in the Fourth Circuit. Boynton Carolina Ale House, 702 F.3d at 1317 (citing Raleigh Ale House, 205 F.3d 137). The Court also found that Miller's asserted trade dress, including "fixing its name in red letters on the outside of its building," was not inherently distinctive, and Miller's did not appeal the district court's finding that it had failed to establish that its trade

dress acquired secondary meaning.   Id. at 1324.   Even though Miller's has made many

of the same arguments to this Court that it made in Boynton Carolina Ale House, the

issues are not identical, mainly because the style of font used in Miller's signs was not an

issue in the previous case.   I therefore recommend that DCCM's motion to dismiss on

the basis of issue preclusion be denied.   But for the reasons that follow, I respectfully

recommend that DCCM be granted summary judgment on Miller's claims under the

Lanham Act.

Miller's argues at length to distinguish its claim from one of trademark or trade

dress infringement and refers to its claim as one for "unfair competition" under § 43(a) of

the Lanham Act.   Regardless of what Miller's calls its claim, it will have to establish a

likelihood of confusion and an impairment of goodwill.   See Dastar Corp., 539 U.S. at 32

("Section 43(a) of the Lanham Act prohibits actions like trademark infringement that

deceive consumers and impair a producer's goodwill."); Two Pesos, Inc. v. Taco Cabana,

Inc., 505 U.S. 763, 780 (1992) (Stevens, J., concurring in judgment) ("Today, it is less

significant whether the infringement falls under 'false designation of origin' or 'false

description or representation' because in either case § 43(a) may be invoked.   The

federal courts are in agreement that § 43(a) creates a federal cause of action for

trademark and trade dress infringement claims.   They are also in agreement that the test

for liability is likelihood of confusion: '[U]nder the Lanham Act [§ 43(a)], the ultimate test is

whether the public is likely to be deceived or confused by the similarity of the marks....

Whether we call the violation infringement, unfair competition or false designation of

origin, the test is identical–is there a 'likelihood of confusion?'") (internal citations and

footnotes omitted); Suntree Techs., Inc. v. Ecosense Int'l, Inc., 693 F.3d 1338, 1346 (11th

Cir. 2012) ("In order to prevail on federal claim of trademark infringement and unfair

competition, a trademark owner 'must show (1) that it had trademark rights in the mark or name at issue and (2) that the other party had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two.'"); Tana, 611 F.3d at 773 ("We have recognized that 'the use of another's unregistered, *i.e.,* common law, trademark can constitute a violation of § 43(a) where the alleged unregistered trademarks used by the plaintiff are so associated with its goods that the use of the same or similar marks by another company constitutes a false representation that its goods came from the same source.'"); Dippin' Dots, Inc., 369 F.3d at 1202 ("In order to prevail on this claim for trade dress infringement under § 43(a), DDI must prove that (1) the product design of the two products is confusingly similar; (2) the features of the product design are primarily non-functional; and (3) the product design is inherently distinctive or has acquired secondary meaning.").

Where the claim is based on the use of a generic term, there must be a showing that the generic term or, as is the case here, the way the generic term is used, has become associated with the proprietor's product or service.   See Blinded Veterans Ass'n, 872 F.2d at 1046 ("Only if BAVF was capitalizing on the public's association of "blinded" and "veterans" with BVA, and therefore reaping the benefits of BVA's goodwill, would the Foundation's actions constitute unfair competition. … To prevail in this action, however, it is not enough for BVA to show confusion that is the natural consequence of the two organizations' use of generic names.   What is essential, we underscore, is evidence that people associate 'blinded veterans' with BVA per se and that, because of specific actions by BAVF that increase the risk of confusion, people are likely to think BAVF is BVA.") (internal citations and footnote omitted).   "Commentators sometimes refer to this association between a generic term and one particular source, arising normally from that

source's monopoly for an extended period, as 'de facto secondary meaning.'" Id. at 1045 n. 22 (quoting J. McCarthy, Trademarks and Unfair Competition § 12:15 at 562-65 (2d. ed. 1984)).   This is analogous to a finding of secondary meaning for trademark protection, id. at 1046 n. 24, which requires a "show[ing] that the primary significance of the term in the minds of the consumer public is not the product but the producer.'" Am. Television & Commc'ns Corp., 810 F.2d at 1549 (quoting Vision Ctr. v. Opticks, Inc., 596 F.2d 111, 118 (5th Cir. 1979)).   See also Tana, 611 F.3d at, 773-74 ("A name has acquired secondary meaning when the primary significance of the term in the minds of the consuming public is not the product but the producer.") (internal quotations omitted).

Miller's restaurants are marked by outdoor signs that typically consist of the phrase "ALE HOUSE" preceded by the geographic location of the restaurant in red, uppercase block letters and may be preceded by the name "Miller's" in red, initial-letter-capitalized-only italics (Doc. 1, ¶¶ 9-13).   Miller's alleges that as a result of widespread promotion, these elements of its signs and similar branding materials have "acquired secondary meaning" in the "greater Orlando/Polk County areas" because they are recognized "by the relevant public as identifying Plaintiff's restaurants and restaurant services, distinguishing them from those of Plaintiff's competitors."   (Id. at ¶ 14).   Miller's represents that it "expects to have consumer survey evidence and related expert opinions by the time expert disclosures are due that will prove that consumers in the central Florida area associate the names of Miller's restaurants and the signs Miller's uses for its restaurants with Miller's."   (Doc. 33, ¶ 2).   Miller's also expects to offer evidence of consumer confusion (Id.).

The Fourth and Eleventh Circuits have already determined that Miller's does not have exclusive rights to the generic term "ale house" coupled with a geographic identifier,

Raleigh Ale House, 205 F.3d at 140; Boynton Carolina Ale House, 702 F.3d at 1321, and

Miller's failed to establish that its trade dress had secondary meaning or was inherently

distinctive in Boynton Carolina Ale House, 702 F.3d at 1321-24.   The Eleventh Circuit

found "nothing particularly unique in a restaurant fixing its name in red letters on the

outside of its building."   Id. at 1324.   The only difference here is Miller's inclusion of

allegations regarding similar font styles.[1]   To the extent that Miller's use of italics and

block letters in its signs may change things, the evidence offered by Miller's is insufficient

to establish a genuine issue of material fact.   Evidence that consumers in the "greater

Orlando/Polk County areas" or "central Florida" associate restaurants with signs bearing

the same naming convention and similar font and color as Miller's signs is insufficient to

establish an association or de facto secondary meaning for purposes of the Lanham Act;

evidence of an association that is limited to consumer's in central Florida says nothing

about whether the general public (or even consumers near Miller's 56 or so other

restaurants around the country) associate signs using the same naming convention, font,

and color as Miller's sign with Miller's.   Cf. Kellogg Co., 305 U.S. at 118-19 ("[D]ue to the

long period in which the plaintiff or its predecessor was the only manufacturer of the

product, many people have come to associate the product, and as a consequence the

name by which the product is generally known, with the plaintiff's factory at Niagara Falls.

… The showing which it has made does not entitle it to the exclusive use of the term

shredded wheat but merely entitles it to require that the defendant use reasonable care to

inform the public of the source of its product."); Singer Mfg. Co. v. June Mfg. Co., 163

U.S. 169, 204 (1896) (holding that "Singer" had become generic denotation of type of

---

[1]   Although both Miller's and DCCM use capital letters for "ALE HOUSE" in their signs, Miller's also uses all capital letters to denote the geographic location of each restaurant, whereas the geographic location of DCCM's restaurant is in italics with only the first letter capitalized.

sewing machine, but requiring that defendant not use the word on its product or in advertisements "without clearly and unmistakably stating ... that the machines are made by the defendant, as distinguished from the sewing machines made by the Singer Manufacturing Company"); Forschner Grp., Inc. v. Arrow Trading Co. Inc., 30 F.3d 348, 359-60 (2d Cir. 1994) ("Since Victorinox and Wenger are the only manufacturers who sell pocketknives to the Swiss Army, there is reason to associate the phrase Swiss Army knife with those two companies."); King-Seeley Thermos Co. v. Aladdin Indus., Inc., 321 F.2d 577, 581 (2d Cir. 1963) (finding "thermos" generic denotation of vacuum-insulated container, but affirming requirement that the defendant distinguish its product from the plaintiff's by preceding "thermos" with "Aladdin's," by using only the lower case "t," and by never using the words "original" or "genuine" in describing its product because "some members of the public and a substantial portion of the trade still recognize and use the word 'thermos' as a trademark"); Boynton Carolina Ale House, 745 F. Supp. 2d at 1371-73.   I therefore recommend that DCCM be granted summary judgment on Miller's claims under the Lanham Act.

I also recommend that the Court decline to exercise supplemental jurisdiction over Miller's state law claims pursuant to 28 U.S.C. § 1367(c)(3), because no federal claims remain and there is nothing special about the state law claims to justify keeping them in this court.   See Dockens v. Dekalb Cty. Sch. Sys., 441 F. App'x 704, 709 (11th Cir. 2011) ("Once the district court properly granted summary judgment for the School System on the FMLA claims, no federal claims remained.   It was not abuse of discretion for the court to decline supplemental jurisdiction over the state law claim.").

A party waives the right to challenge on appeal a finding of fact or conclusion of law adopted by the district judge if the party fails to object to that finding or conclusion

within fourteen days after issuance of the Report and Recommendation containing the

finding or conclusion.

      **RESPECTFULLY RECOMMENDED** in Orlando, Florida on November 18, 2015.

THOMAS B. SMITH
United States Magistrate Judge


Copies furnished to:

      Presiding United States District Judge
      Counsel of Record